IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 3:14cr 12 |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 1349 |
| | ) | (Conspiracy to Commit Honest-Services Wire Fraud) |
| | ) | |
| ROBERT F. MCDONNELL | ) | |
| (Counts 1–13) | ) | Counts 2–4: 18 U.S.C. § 1343 |
| | ) | (Honest-Services Wire Fraud) |
| and | ) | |
| | ) | Count 5: 18 U.S.C. § 1951 |
| MAUREEN G. MCDONNELL, | ) | (Conspiracy to Obtain Property under Color of Official Right) |
| (Counts 1–11, 13–14) | ) | |
| | ) | |
| Defendants. | ) | Counts 6–11: 18 U.S.C. § 1951 |
| | ) | (Obtaining Property under Color of Official Right) |
| | ) | |
| | ) | |
| | ) | Counts 12–13: 18 U.S.C. § 1014 |
| | ) | (False Statements) |
| | ) | |
| | ) | Count 14: 18 U.S.C. § 1512(c)(2) |
| | ) | (Obstruction of Official Proceeding) |
| | ) | |
| | ) | Forfeiture Notice |

January 2014 Term - at Richmond, Virginia

## INDICTMENT

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise stated:

GENERAL ALLEGATIONS

A.    **The Defendants**

1.    Defendant ROBERT F. MCDONNELL was the Governor of the Commonwealth of Virginia.  He previously served as a member of the Virginia House of Delegates and as the

Attorney General of Virginia. ROBERT MCDONNELL was sworn in as the 71st Governor of Virginia in January 2010.

    2.      Defendant MAUREEN G. MCDONNELL was the wife of ROBERT MCDONNELL and served as the First Lady of Virginia.

**B.**    **Relevant Individuals and Entities**

    3.      MoBo Real Estate Partners, LLC ("MoBo") was a Virginia limited liability company engaged in the business of owning and renting vacation homes in Virginia Beach, Virginia. ROBERT MCDONNELL was one of two members of, and had a 50% personal financial interest in, MoBo.

    4.      Star Scientific, Inc. ("Star Scientific") was a Delaware corporation with its principal executive offices located in Glen Allen, Virginia. Star Scientific was a publicly traded company on the NASDAQ Global Market under the ticker symbol "STSI." Star Scientific was involved in and its activities affected interstate commerce.

    5.      JW was the Chief Executive Officer of Star Scientific.

**C.**    **The Governor and the Governor's Office**

    6.      The Governor and the Office of the Governor of the Commonwealth of Virginia ("OGV") performed a wide range of official actions. Those actions included, among other things, appointing directors and key administrators of state departments, agencies, and boards; authorizing expenditures of certain grant funds; proposing a budget and overseeing the expenditure of state funds; conducting meetings and hosting events for the purposes of fostering Virginia business and economic development; directing other government officials to conduct such meetings and events; speaking at events in and outside Virginia about Virginia businesses and economic development; coordinating with state boards, commissions, and institutions,

including universities, about uses of state labor and funding resources; and otherwise setting priorities and direction for the Commonwealth of Virginia.

7.    Throughout his campaign for Governor, ROBERT MCDONNELL made it clear that one of his highest priorities as Governor would be acting to promote the matter and cause of economic development for businesses and industries in Virginia, *e.g.* his campaign slogan was "Bob's for Jobs." Throughout his tenure as Governor, ROBERT MCDONNELL customarily performed official actions to promote the matter and cause of economic development of Virginia businesses and industries, and he touted his efforts and activities in support of the same.

D.    **Background of Star Scientific's Dietary Supplement Products**

8.    Star Scientific described itself as a "technology-oriented company with a mission to promote maintenance of a healthy metabolism and lifestyle." Beginning in or about 2007, the company focused on utilizing certain alkaloids in the tobacco plant, namely anatabine, to address issues related to the desire to smoke. Star Scientific subsequently began evaluating anatabine's potential for treating chronic inflammation that the company believed might be associated with disorders such as thyroiditis, diabetes, arthritis, Alzheimer's disease, and multiple sclerosis.

9.    Star Scientific, through a wholly owned subsidiary, engaged in the development, manufacture, marketing, and sale of two anatabine-based dietary supplements: CigRx®, a tobacco alternative; and Anatabloc®, for anti-inflammatory support.

10.    The types of claims that Star Scientific could make under applicable federal law regarding its dietary supplements CigRx® and Anatabloc® differed substantially from those allowed for drug manufacturers. While drug manufacturers could claim that their products would diagnose, cure, mitigate, treat, or prevent a disease, dietary supplement manufacturers such as Star Scientific were legally prohibited from making such claims. These legal limitations

3

made it more challenging for Star Scientific to gain widespread consumer acceptance of the potential health benefits for its dietary supplement products.

11.    To overcome the difficulties in gaining consumer acceptance for its products, Star Scientific sought to legitimize the potential health benefits of its dietary supplements by encouraging scientific studies of anatabine, which was an active ingredient in CigRx® and Anatabloc®. Star Scientific would then present the results of those studies to physicians in the hope that the physicians would recommend Star Scientific's dietary supplements to their patients.

12.    Another of Star Scientific's goals was to have scientific studies of human use of anatabine, including in clinical trials, that would allow the company to develop drugs for the treatment of diseases such as thyroiditis, diabetes, arthritis, Alzheimer's disease, and multiple sclerosis.

**E.    Background of the Defendants' Relationship with JW**

13.    In or about March 2009, as a result of requests from ROBERT MCDONNELL's staff to JW, ROBERT MCDONNELL began using a jet aircraft owned by JW during his campaign for Governor of Virginia.  Prior to this time, ROBERT MCDONNELL and JW had never met, and they had no personal or professional relationship.

14.    On or about November 3, 2009, ROBERT MCDONNELL was elected Governor of Virginia.  While ROBERT MCDONNELL and JW had met briefly during the campaign as a result of ROBERT MCDONNELL's use of JW's aircraft, they had no personal relationship and were merely professional acquaintances at the time that ROBERT MCDONNELL became Governor-Elect.

15.    In or about December 2009, ROBERT MCDONNELL attended a political event at the Four Seasons Hotel in New York City. As a result of a request by JW to one of ROBERT MCDONNELL's staff, JW met with ROBERT MCDONNELL and MAUREEN MCDONNELL at the Four Seasons Hotel. During the meeting, MAUREEN MCDONNELL asked for assistance in finding a designer dress for her husband's upcoming inauguration as Governor, and JW agreed to help. MAUREEN MCDONNELL subsequently informed JE, one of ROBERT MCDONNELL's senior staff members, that JW had agreed to purchase a designer dress by Oscar de la Renta for MAUREEN MCDONNELL for the inauguration. JE expressed concerns regarding the prospect of JW purchasing MAUREEN MCDONNELL's inaugural dress and ultimately informed her that JW's purchase of a designer dress for the inauguration would be inappropriate and should not be done. As a result, MAUREEN MCDONNELL became upset with JE.

16.    On or about December 21, 2009, MAUREEN MCDONNELL sent an email to JE, stating:

> I need to talk to you about Inaugural clothing budget. I need answers and Bob is screaming about the thousands I'm charging up in credit card debt. We are broke, have an unconscionable amount in credit card debt already, and this Inaugural is killing us!! I need answers and I need help, and I need to get this done.

MAUREEN MCDONNELL subsequently told JW that she could not accept the dress at that time but that she would take a "rain check" from him.

17.    On or about October 3, 2010, JW agreed to let ROBERT MCDONNELL use JW's aircraft to fly from Richmond, Virginia, to Sacramento, California, for a political event. JW met ROBERT MCDONNNELL in Sacramento, California, and accompanied him on the return flights to Richmond. JW used the trip as an opportunity to discuss Star Scientific's products directly with ROBERT MCDONNELL. During the return flights, JW informed

ROBERT MCDONNELL of the significant potential health benefits of anatabine and the need

for scientific studies of these potential health benefits. JW told ROBERT MCDONNELL that

Star Scientific needed the assistance of the Virginia government, and ROBERT MCDONNELL

told JW that he would put JW in contact with the Virginia Secretary of Health and Human

Resources (the "Virginia Secretary of Health").

18.    On or about October 12, 2010, an OGV staff member emailed the Virginia

Secretary of Health and attached a copy of a press release that had been forwarded by JW's

assistant. The press release announced the beginning of clinical trials of anatabine (also referred

to as "RCP-006," a compound whose active ingredient is anatabine) for the treatment of

Alzheimer's disease. In the email, the OGV staff member stated, "[T]he Governor would like

you to review the attached. I am sending the original note up to you today."

19.    On or about November 4, 2010, JW met with the Virginia Secretary of Health to

discuss Star Scientific's products. The meeting had been previously arranged by an OGV staff

member. During the meeting, JW discussed the potential health benefits of Star Scientific's

products. The Virginia Secretary of Health was skeptical regarding JW's claims because Star

Scientific's products had not been scientifically proven to be effective. JW requested that the

Virginia Secretary of Health visit the Roskamp Institute, a Florida-based research group that had

financial ties to Star Scientific and had begun scientific studies of anatabine. The Virginia

Secretary of Health ultimately rejected JW's invitation to visit the Roskamp Institute.

20.    On or about February 3, 2011, Star Scientific invited doctors and health

professionals to a seminar dinner at the Jefferson Hotel in Richmond, Virginia, for its CigRx®

product. The dinner was part of Star Scientific's marketing strategy of gaining consumer

acceptance by convincing doctors and health professionals to recommend CigRx® to their

patients. On the day of the dinner, JW contacted one of the OGV staff members and requested that ROBERT MCDONNELL come to the CigRx® event and address the attendees. That evening, both ROBERT MCDONNELL and MAUREEN MCDONNELL came to the event at the Jefferson Hotel. ROBERT MCDONNELL made brief remarks in support of Star Scientific to the doctors and health professionals in attendance. Star Scientific subsequently received the OGV's approval to put pictures of ROBERT MCDONNELL speaking at the CigRx® event on the company's Facebook and Twitter social media sites.

21. As of in or about 2009 and continuing through 2012, MoBo's two Virginia Beach properties required capital infusions of up to $60,000 annually to meet mortgage payments and other expenses. MoBo relied on loans, including those from family and friends, to make up the difference. MoBo explored the possibility of selling the two properties without success as their values were declining. MoBo also began to explore refinancing the heavily leveraged properties.

**F.    The Scheme**

22. As set forth in greater detail below, from in or about April 2011 through in or about March 2013, the defendants participated in a scheme to use ROBERT MCDONNELL's official position as the Governor of Virginia to enrich the defendants and their family members by soliciting and obtaining payments, loans, gifts, and other things of value from JW and Star Scientific in exchange for ROBERT MCDONNELL and the OGV performing official actions on an as-needed basis, as opportunities arose, to legitimize, promote, and obtain research studies for Star Scientific's products, including Anatabloc®. And as also detailed below, the defendants took steps throughout that time to conceal the scheme.

7

23.    On or about April 11, 2011, MAUREEN MCDONNELL contacted JW and requested that he take her shopping in New York City for the designer dress by Oscar de la Renta. MAUREEN MCDONNELL explained that she and ROBERT MCDONNELL were attending a political event at the Union League Club in New York City on April 13, 2011, and that she would ensure that JW was seated next to ROBERT MCDONNELL at the event. JW agreed to pay for the shopping trip.

24.    On or about April 13, 2011, JW accompanied MAUREEN MCDONNELL to several luxury stores in New York City, including Oscar de la Renta, Louis Vuitton, and Bergdorf Goodman. MAUREEN MCDONNELL informed JW that she needed dresses and accessories for her daughter's upcoming wedding and for her and ROBERT MCDONNELL's upcoming anniversary party. JW paid for the entire luxury shopping trip for MAUREEN MCDONNELL and spent approximately $10,999 at Oscar de la Renta, approximately $5,685 at Louis Vuitton, and approximately $2,604 at Bergdorf Goodman. As promised by MAUREEN MCDONNELL, JW was seated next to ROBERT MCDONNELL at the Union League Club event later that evening.

25.    On or about April 29, 2011, JW and his wife attended a private dinner at the Governor's Mansion with ROBERT MCDONNELL and MAUREEN MCDONNELL. During the dinner, JW and his wife discussed Star Scientific's products with the defendants. During the dinner, JW and his wife met CM, one of the defendants' daughters. JW and his wife had not previously met CM, who they learned was getting married in June 2011.

26.    On or about May 2, 2011, JW had a private meeting with MAUREEN MCDONNELL at the Governor's Mansion. During the meeting, MAUREEN MCDONNELL informed JW that she and ROBERT MCDONNELL were having severe financial difficulties.

MAUREEN MCDONNELL asked JW for a $50,000 loan.  MAUREEN MCDONNELL also told JW that she could help Star Scientific but that she needed JW's financial assistance.

27.     MAUREEN MCDONNELL also informed JW that she and ROBERT MCDONNELL did not know how they were going to pay for their daughter's upcoming wedding expenses, and she asked for JW's assistance.  JW asked how much money was needed, and MAUREEN MCDONNELL responded that $15,000 was needed to pay the remaining catering costs.

28.     Before agreeing to provide the requested financial assistance to the defendants, JW spoke directly with ROBERT MCDONNELL about the $50,000 loan.  In that conversation, ROBERT MCDONNELL explained the defendants' financial difficulties.  ROBERT MCDONNELL informed JW that the rental income from the defendants' rental properties in Virginia Beach was not covering the bills from those properties.  JW agreed to provide the $50,000 loan with a two-year term at 5% interest.  JW also informed ROBERT MCDONNELL that loan paperwork was not necessary.

29.     On or about May 9, 2011, an OGV staff member sent an email to the Virginia Secretary of Health stating:

> The Governor said that he sent you some material on the RosKamp Institute (http://www.rfdn.org/) and that you were going to get back to him regarding your thoughts on the organization.  Have you had a chance to look at that yet?  If so, could you let me know your thoughts?  We are currently evaluating having the Governor go down to Florida to speak to this group and wanted to get your feedback prior to moving forward on this.

The Virginia Secretary of Health sent a response email stating "[h]e mentioned this to me on Thursday so I have not gotten to it yet.  How soon do you need to make a decision?"  The OGV staff member responded via email that "[t]he person inviting the Governor is a good friend so I would like to be as responsive as possible."

30.     On or about May 9, 2011, an OGV staff member sent an email to JW's assistant stating:

> I spoke with the Governor regarding flying down to speak to the RosKamp
> institute on June 1st. Unfortunately, after checking with his daughter (she is
> getting married that Saturday) he doesn't believe he will be able to attend due to
> some Dad commitments that day. I'm so sorry this won't work out! What else
> can we do to fix this?

31.     On or about May 17, 2011, MAUREEN MCDONNELL entered a calendar event on her electronic calendar for her attendance at the June 1, 2011, Star Scientific event at the Roskamp Institute in Florida.

32.     On or about May 23, 2011, JW instructed his assistant to write two checks: (a) a $50,000 check (No. 1001) made payable to MAUREEN MCDONNELL; and (b) a $15,000 check (No. 1002) made payable in blank with a memo annotation of "wedding gift." On or about May 23, 2011, JW also visited MAUREEN MCDONNELL at the Governor's Mansion and gave her the two checks.

33.     On or about May 25, 2011, MAUREEN MCDONNELL deposited the $50,000 check (No. 1001) into her personal bank account (No. xxxx4417) at Wells Fargo Bank (d/b/a Wachovia Bank). Prior to that deposit, MAUREEN MCDONNELL's personal bank account had an available balance of approximately $4,798.

34.     Between on or about May 25, 2011, and on or about May 31, 2011, MAUREEN MCDONNELL made the following payments from her Wells Fargo Bank (d/b/a Wachovia Bank) account (No. xxxx4417): (a) a $10,638.83 payment to Pentagon Federal Credit Union ("PenFed") for a credit card held solely in the name of ROBERT MCDONNELL; (b) a $9,900 payment to Bank of America for a credit card held jointly in both defendants' names; and (c) a $1,500 payment to MoBo.

35.     On or about May 26, 2011, the catering company for CM's wedding cashed the $15,000 check referenced above (No. 1002).  On or about December 29, 2010, ROBERT MCDONNELL had signed the contract with the catering company for CM's wedding and had made two payments totaling $7,948.50 in December 2010 and January 2011 as deposits on that contract.  On or about June 13, 2011, after CM's wedding, the catering company refunded $5,266.50 via check to MAUREEN MCDONNELL.  MAUREEN MCDONNELL caused the refund check to be deposited into her Wells Fargo Bank (d/b/a Wachovia Bank) account (No. xxxx4417) on or about June 21, 2011.

36.     On or about May 28, 2011, ROBERT MCDONNELL sent an email to JW stating "Thanks so much for all your help with my family.  Your very generous gift to [CM] was most appreciated as well as the golf round tomorrow for the boys.  Maureen is excited about the trip to fla to learn more about the products and to see [JW's wife].  Have a restful weekend with your family.  Thanks."

37.     On or about May 29, 2011, ROBERT MCDONNELL, his two sons, and his future son-in-law played golf at Kinloch Golf Club ("Kinloch"), an exclusive private golf course in Manakin-Sabot, Virginia.  JW was a member at Kinloch and had agreed to pay for ROBERT MCDONNELL and his family's golf outing there even though JW would not be playing with them.  During the round of golf, ROBERT MCDONNELL and his family charged approximately $2,380 to JW's Kinloch member account, including approximately $1,200 in greens fees, $500 in caddie fees, $410 in merchandise at the pro shop, and $270 in food and beverages.

38.     On or about June 1, 2011, MAUREEN MCDONNELL opened a brokerage account at Brokerage Firm A.

11

39.     On or about June 1, 2011, MAUREEN MCDONNELL purchased 6,000 shares of Star Scientific stock in her newly opened Brokerage Firm A account. To pay for the purchase, MAUREEN MCDONNELL wrote a check from her Wells Fargo Bank (d/b/a Wachovia Bank) account (No. xxxx4417) for approximately $31,079.

40.     On or about June 1, 2011, MAUREEN MCDONNELL and her Chief of Staff, a Virginia government employee, traveled on JW's private aircraft to Star Scientific's event at the Roskamp Institute in Sarasota, Florida. MAUREEN MCDONNELL spoke at the event, which was heavily attended by Star Scientific's investors, and announced that she was offering the Governor's Mansion for the location of Star Scientific's official product launch of Anatabloc®.

41.     On or about June 16, 2011, JW's assistant emailed an attached letter dated that same day to MAUREEN MCDONNELL's Chief of Staff. The letter was from JW, addressed to ROBERT MCDONNELL, and stated, in part:

> The particular intent of this letter is to provide the Commonwealth of Virginia
> with a technology platform to lower healthcare costs.
> ...
> I am suggesting that you use the attached protocol to initiate the 'Virginia Study'
> of Anatabloc at the Medical College of Virginia and the University of Virginia
> School of Medicine, with an emphasis on endocrinology, cardiology,
> osteoarthritis and gastroenterology.
> ...
> This landmark study will provide the data for an evaluation of the economic
> impact of Anatabloc in healthcare, and if we are right then I believe that the
> results of the Virginia study will have a major impact on reducing healthcare costs
> for Virginia.

MAUREEN MCDONNELL's Chief of Staff subsequently forwarded the letter by email to MAUREEN MCDONNELL.

42.     In or about early July 2011, Star Scientific began exploring possible funding sources for scientific studies at Virginia research universities of Anatabloc's® potential health benefits. In particular, Star Scientific was interested in obtaining grant funding from the Virginia

12

Tobacco Indemnification and Community Revitalization Commission ("Tobacco Commission"),

which provides grants for the promotion of economic growth and development in tobacco-

dependent communities using proceeds of the national tobacco settlement. It was important to

Star Scientific that these studies not be funded by the company for two primary reasons: (a) the

studies would be very expensive and would strain Star Scientific's finances, and (b) having third-

party funding would enhance the perceived legitimacy of the results of the studies in the

scientific community.

43.    The Tobacco Commission would not provide grants to for-profit entities.

Therefore, Star Scientific developed a plan to encourage Virginia state research universities (e.g.

the University of Virginia ("UVa") and Virginia Commonwealth University ("VCU," formerly

Medical College of Virginia ("MCV"))) to apply to the Tobacco Commission for grants to

perform scientific research of anatabine, the main active ingredient in the company's products.

44.    In or about early July 2011, to effectuate its plan, Star Scientific began reaching

out to scientific researchers at Virginia state universities. In addition to informing these

researchers about the preliminary scientific results that indicated that anatabine might have

health benefits for the treatment of various medical conditions, Star Scientific informed the

Virginia state researchers that ROBERT MCDONNELL and MAUREEN MCDONNELL

supported the research of the company's products and that the Tobacco Commission was a

potential source of grant funding for the research.

45.    On or about July 23, 2011, Star Scientific held a symposium at Gibson Island,

Maryland, to discuss potential scientific studies of anatabine. The company invited researchers

from UVa and VCU to attend the symposium to learn more about these studies and potential

research funding from the Tobacco Commission. In addition, MAUREEN MCDONNELL's

Chief of Staff was invited to attend. The state researchers and MAUREEN MCDONNELL's Chief of Staff traveled together to and from the all-day symposium on JW's private aircraft.

46.     From on or about July 28, 2011, through on or about July 31, 2011, ROBERT MCDONNELL, MAUREEN MCDONNELL, and their family members enjoyed a private vacation at JW's multimillion-dollar vacation home on Smith Mountain Lake in Virginia. MAUREEN MCDONNELL had previously called JW to ask whether JW's Ferrari would be at the house for ROBERT MCDONNELL's use. JW arranged to have a Star Scientific employee transport the Ferrari from Richmond to his Smith Mountain Lake house so that the defendants could use the Ferrari during their vacation. In addition, JW rented a boat specifically for the defendants' use during the vacation.

47.     On or about July 31, 2011, at approximately 7:47 p.m., MAUREEN MCDONNELL sent an email to JW that contained no text but had an attached picture of ROBERT MCDONNELL driving JW's Ferrari.

48.     On or about July 31, 2011, at approximately 11:29 p.m., ROBERT MCDONNELL sent an email to the Virginia Secretary of Health stating that ROBERT MCDONNELL "would like to have [one of the Secretary of Health's Deputies] attend a short briefing at the mansion about 10am with first lady on the Star Scientific anatablock [sic] trials planned in va at vcu and uva."

49.     On or about August 1, 2011, as a result of ROBERT MCDONNELL's email to the Virginia Secretary of Health the night before, MAUREEN MCDONNELL, JW, and a senior policy advisor to the Virginia Secretary of Health met at the Governor's Mansion. JW informed the policy advisor that research scientists at UVa and MCV were interested in doing clinical trials of the potential health benefits of Anatabloc® for autoimmune diseases. JW explained that

14

the research scientists at the Virginia universities would get small planning grants to develop test protocols so that large grant proposals could be submitted to the Tobacco Commission. In MAUREEN MCDONNELL's presence, JW told the policy advisor that he anticipated Tobacco Commission funding for these studies and that he had discussed this with ROBERT MCDONNELL. In addition, JW discussed the idea of having Virginia government employees use Anatabloc® as a control group for research studies.

50.     On or about August 1, 2011, MAUREEN MCDONNELL also met privately with JW. During the meeting, MAUREEN MCDONNELL noticed JW's watch and asked what brand it was. JW informed her that it was a Rolex. She informed JW that she would like to get one for ROBERT MCDONNELL because he would like a Rolex. JW expressed concern regarding whether ROBERT MCDONNELL would actually wear such a luxury watch given his role as a senior government official. MAUREEN MCDONNELL told JW that she wanted JW to buy a Rolex for ROBERT MCDONNELL. JW subsequently bought a Rolex for ROBERT MCDONNELL. When JW contacted MAUREEN MCDONNELL to ask her what she wanted engraved on the watch, MAUREEN MCDONNELL instructed JW to have "71st Governor of Virginia" engraved on the back of the Rolex.

51.     On or about August 1, 2011, MAUREEN MCDONNELL entered a calendar event on her electronic calendar for her attendance on August 30, 2011, for a "Lunch w/ VA researchers."

52.     On or about August 1, 2011, the senior policy advisor from the Virginia Secretary of Health's office who had met with JW and MAUREEN MCDONNELL earlier that day sent an email to JW. In the email, the policy advisor stated that "it is necessary for us to make policy recommendations and decisions off of sound data" and that she was "grateful that [JW was]

making strides to validate the incredible anecdotes and stories that result from your work." The policy advisor concluded the email by stating that she would "continue to work alongside of the First Lady as we identify how best to move forward."

53.    On or about August 2, 2011, MAUREEN MCDONNELL ordered Brokerage Firm A to purchase an additional 522 shares of Star Scientific stock for her account.

54.    On or about August 4, 2011, MAUREEN MCDONNELL sent an email to ROBERT MCDONNELL, forwarding a quote from a stock market analyst who covered Star Scientific's stock. In the forwarded quote, the stock market analyst stated that "[a]s an economist, however, I am utterly certain that Anatabloc is going to shake our political system to its very roots. This is because even tiny changes to the actuarial tables will have enormous budgetary impacts." MAUREEN MCDONNELL annotated the importance of the email as "high."

55.    On or about August 5, 2011, MAUREEN MCDONNELL sent an email to the above-referenced stock market analyst. In her email – which was in response to the analyst forwarding a favorable article about Star Scientific's Anatabloc® – MAUREEN MCDONNELL asked, "Would it be possible for you to send this as an attachment like you did in the first email so I would be able to print out a clean copy for my husband?"

56.    On or about August 5, 2011, one of the defendants' sons and his friend played golf at Kinloch. Even though JW was not playing with them, they played as JW's guests and charged approximately $618 to JW's Kinloch member account, including approximately $300 in greens fees, $100 in caddie fees, and $214 in merchandise at the pro shop.

57.    On or about August 11, 2011, the defendants' two sons and a friend played golf at Kinloch. Even though JW was not playing with them, they played as JW's guests and charged

16

approximately $1,309 to JW's Kinloch member account, including approximately $900 in greens fees, $300 in caddie fees, and $109 in food and beverages.

58.    On or about August 12, 2011, MAUREEN MCDONNELL's Chief of Staff asked an OGV staff member to put a lunch that MAUREEN MCDONNELL was hosting for a number of researchers and doctors on August 30, 2011, on ROBERT MCDONNELL's schedule for that day.

59.    On or about August 13, 2011, ROBERT MCDONNELL and one of his sons played golf at Kinloch. Even though JW was not playing with them, they played as JW's guests and charged approximately $869 to JW's Kinloch member account, including approximately $600 in greens fees, $200 in caddie fees, $53 in merchandise at the pro shop, and $16 in food and beverages.

60.    On or about August 30, 2011, the defendants hosted an event for the launch of Star Scientific's Anatabloc® product at the Governor's Mansion. JW had previously coordinated the list of invitees for the event with MAUREEN MCDONNELL and her staff. The invitees included some of the same UVa and VCU research scientists whom Star Scientific was attempting to convince to perform clinical trials of Anatabloc®. Prior to the event, MAUREEN MCDONNELL and JW placed samples of Anatabloc® at each table setting. On the day of the event, Star Scientific issued a press release stating, in pertinent part:

> Star Scientific, Inc. (NASDAQ: CIGX) has announced that the company is pleased to initiate the launch today of Anatabloc™, a dietary supplement that is designed to support the immune system in maintaining healthy levels of inflammation.
> ...
> A group of Richmond area physicians and healthcare providers are gathering at the Virginia Governor's mansion today to learn more about the state of the research of Anatabloc™. The lead researchers who have overseen pre-clinical studies will discuss the results of testing with this group. They will be joined by researchers from the University of Virginia Medical School and the VCU Medical

> Center who also are interested in studying further potentials for Anatabloc™.
> [Star Scientific's affiliate] has solicited research proposals from these institutions,
> and expects to issue planning grants for the preparation of full research proposals.

ROBERT MCDONNELL attended the Star Scientific event at the Governor's Mansion and

spoke favorably to the attendees regarding further study of anatabine. During the event, JW

presented $25,000 checks to UVa and VCU research scientists as planning grants to encourage

UVa and VCU to prepare full research proposals for scientific studies of anatabine.

61.    On or about September 9, 2011, a broker at Brokerage Firm A wrote a letter to

MAUREEN MCDONNELL outlining a prior conversation between the two. In that

conversation, MAUREEN MCDONNELL had requested information from the broker regarding

ways to avoid the Star Scientific shares held in her Brokerage Firm A account remaining in her

name. She had informed the broker that she wanted the shares out of her name by the end of the

year in order to avoid certain annual reporting requirements. Among the options that

MAUREEN MCDONNELL had mentioned were gifting the shares to her children or setting up a

blind trust. The broker wrote the September 9, 2011, letter to MAUREEN MCDONNELL

because he was uncomfortable with MAUREEN MCDONNELL's request that he assist her in

financial transactions designed to avoid annual reporting requirements. In the letter, the broker

stated:

> The 6,522 shares you purchased of Star Scientific, Inc. are currently titled in your
> name alone. My understanding is that you would like to gift a portion of these
> shares to each of the children, either now or at some point in the future, and
> possibly end up with zero shares in your name.
>
> ...
>
> I don't have the answer about how to avoid shares remaining in your name,
> without transferring them to another entity. You had mentioned the use of a blind
> trust. If you have an attorney draft the trust, we can open and operate this type of
> account. However, the blind trust is a discretionary account that we would
> manage, and you essentially would have no direction in the purchase or sale of
> securities. As such, rather than owning shares of Star Scientific, you most likely
> would end up with a portfolio of well-known large dividend paying companies

18

and bonds. I think this would defeat the purpose, at least for your intent of this Star Scientific investment.

62.　　On or about October 18, 2011, Star Scientific held a dinner at the Westin Hotel in Richmond, Virginia, for local area doctors and health care professionals to learn more about Anatabloc®. MAUREEN MCDONNELL was the featured guest of the dinner and spoke favorably regarding Star Scientific and its products.

63.　　On or about October 22, 2011, Star Scientific held a dinner at the Warwick Hills Golf & Country Club in Grand Blanc, Michigan, for local area doctors and health care professionals to learn more about Anatabloc®. MAUREEN MCDONNELL was the featured guest of the dinner and spoke favorably regarding Star Scientific and its products. MAUREEN MCDONNELL flew to and from the event on JW's private jet. During the flights, MAUREEN MCDONNELL, JW, and a research scientist who consulted for Star Scientific discussed the potential health benefits of Anatabloc® and the need for clinical studies. The next day, the research scientist sent MAUREEN MCDONNELL an email summarizing the discussions on board JW's aircraft. In the email, the research scientist wrote about the lack of data regarding the number of people who suffer from autoimmune and chronic inflammatory conditions. He stated that "it would be of value to perform a study of Virginia government employees . . . to determine the prevalences [sic] of autoimmune and inflammatory conditions." The research scientist further stated, "Next, to tie in [JW's] anti-inflammatory product, one could add a follow-up data assessment . . . to assess whether the inflammatory markers screened for at the initial visit have been decreased in employees who have taken anatabine."

64.　　On or about October 24, 2011, MAUREEN MCDONNELL sent a response email to the research scientist stating "[t]hanks for your email and I printed your [sic] it out and shared

it with my husband. He said he'd like to talk to some people to look into it and discern what the best approach for Virginia would be."

65.     During the fall of 2011, Star Scientific was trying to effectuate its plans for the studies at UVa and VCU by encouraging those state research universities to make grant funding applications to the Tobacco Commission for the scientific study of anatabine. As part of that effort, on or about November 29, 2011, executives at Star Scientific had a conference call with senior UVa administrators, who were Virginia government employees. The Star Scientific executives requested that UVa take the lead role among the Virginia research universities in making the grant applications to the Tobacco Commission and overseeing the use of any grant funding. The UVa administrators expressed interest but did not agree to Star Scientific's requests during the call.

66.     Under Virginia law, certain state officials and employees – including the Governor and members of his staff – are required to annually file a standardized disclosure statement of their personal economic interests on or before January 15 each year. The disclosure statement is commonly referred to as the Statement of Economic Interest ("SOEI"), and it is legally required to be filed and maintained as a public record for five years. The SOEI requires a state official to: (a) disclose personal liabilities held by the state official or that official's immediate family members of more than $10,000 to any one creditor, and to state the principal business or occupation for each of those creditors; (b) disclose securities held by the state official or that official's immediate family members valued in excess of $10,000 in a company, and to list the name of the company and the type of security; and (c) disclose gifts or entertainment valued in excess of $50 received by the state official from any business or individual (other than a relative or close personal friend), and to list the name of the business or individual and the

20

approximate value of the gift or entertainment. Pursuant to Virginia law, the state official must swear or affirm that the information provided on the SOEI is full, true, and correct to the best of that official's knowledge.

67.    On or about December 20, 2011, MAUREEN MCDONNELL sold 6,522 shares of Star Scientific stock held in her Brokerage Firm A account, leaving her with no shares held in her name at year-end. MAUREEN MCDONNELL made it clear to the Brokerage Firm A broker overseeing the account that the sale of the Star Scientific stock had to occur before year-end in order to avoid annual reporting requirements.

68.    On or about December 25, 2011, MAUREEN MCDONNELL gave ROBERT MCDONNELL the Rolex watch – inscribed on the back with "71st Governor of Virginia" – that JW had purchased pursuant to MAUREEN MCDONNELL's instructions.

69.    On or about January 7, 2012, ROBERT MCDONNELL and his two sons played golf at Kinloch. Even though JW was not playing with them, they played as JW's guests and charged approximately $1,424 to JW's Kinloch member account, including approximately $990 in greens fees, $200 in caddie fees, $53 in merchandise at the pro shop, and $181 in food and beverages.

70.    On or about January 15, 2012, ROBERT MCDONNELL filed his SOEI. On the SOEI, ROBERT MCDONNELL stated that neither he nor any member of his immediate family owned securities valued in excess of $10,000 invested in any one business. On the personal liability section of the SOEI, ROBERT MCDONNELL stated that the personal liabilities of his immediate family members to individual creditors were in an amount between $10,001 and $50,000 and that the principal business or occupation of the creditor was "Medical Services." On the gift section of the SOEI, the only gift from JW that ROBERT MCDONNELL disclosed

was listed as "Lodging and entertainment" in the amount of $2,268, which was the amount JW

paid for the boat rental for the defendants' use during their private family vacation at JW's

multimillion-dollar home on Smith Mountain Lake in July 2011.

71.     On or about January 20, 2012, MAUREEN MCDONNELL used all of the sale

proceeds in her Brokerage Firm A brokerage account from the December 20, 2011, sale of Star

Scientific stock to purchase 6,672 shares of Star Scientific stock.

72.     On or about January 25, 2012, ROBERT MCDONNELL received an email from

MU, who was ROBERT MCDONNELL's brother-in-law and was assisting in the day-to-day

operations of MoBo's beach rental properties. In the email, MU stated, "For MoBo, I talked

with [MAUREEN MCDONNELL] last week and she had me talk to the guy who is helping us.

He said he was going to call me the next day to get an address so he could send the first check. I

did not hear from him and I left [MAUREEN MCDONNELL] a message yesterday. We'll need

to get that in the next week so we can keep up-to-date."

73.     On or about January 27, 2012, ROBERT MCDONNELL sent an email to

MAUREEN MCDONNELL that forwarded MU's email and stated, "Maureen who are we

talking about that is helping us and talking to [MU]?? [JW]?" That same day, MAUREEN

MCDONNELL sent a response email to ROBERT MCDONNELL stating "Just got home. I'll

talk w u upstairs."

74.     In or about January 2012, the Virginia Secretary of Health and his staff were

planning a reception for healthcare leaders that would occur at the Governor's Mansion on

February 29, 2012. The Secretary of Health and his staff put together an invitation list of those

individuals whom the Secretary wanted to recognize as leaders in healthcare policy in Virginia.

The list did not include JW, Star Scientific executives, or researchers affiliated with Star

Scientific. MAUREEN MCDONNELL informed JW about the reception and allowed JW to

invite dozens of individuals, including Star Scientific executives, researchers affiliated with Star

Scientific, and doctors whom Star Scientific was trying to convince to recommend Anatabloc® to

their patients. For example, on or about February 4, 2012, MAUREEN MCDONNELL emailed

JW and a marketing representative for a Star Scientific affiliate and wrote:

> We appreciate the list of Docs that you sent, but wanted you to know that you
> didn't have to limit them to this area; It's a reception for Healthcare Leaders from
> all over the state of Virginia, so please expand on your list. I checked our number
> of invites, and if [JW] has any more than these 39 docs, send them along because
> we have room to invite more.

75.    Because the healthcare leaders reception was to occur at the Governor's Mansion,

the Secretary of Health's staff coordinated the invitation list with an OGV staff member who

oversaw Mansion events. On or about February 8, 2012, the OGV staff member sent an email to

a Secretary of Health staff member informing her that the defendants had reviewed the invitation

list and that ROBERT MCDONNELL wanted to make sure that the "Head officers at

VCU/MCV, UVA, EVMS, [and the] Massey Cancer Center" were included on the list.

76.    On or about February 9, 2012, MAUREEN MCDONNELL sent an email to

ROBERT MCDONNELL, with a courtesy copy to the personal email account of JE, who served

on ROBERT MCDONNELL's staff as Counselor and Senior Policy Advisor to the Governor.

The subject line of the email was "FW: Anatabine clinical studies – UVA, VCU, JHU." In the

email, MAUREEN MCDONNELL stated, "Here's the info from JW. He has calls in to VCU &

UVA & no one will return his calls." The email forwarded an earlier email from a Star Scientific

employee to JW, which described the November 29, 2011, call between senior Star Scientific

executives and senior UVa officials regarding UVa's role in submitting a grant application to the

Tobacco Commission for research funding of Anatabloc®. MAUREEN MCDONNELL's email

23

to ROBERT MCDONNELL also forwarded two attachments. One of the attachments was an internal Star Scientific memorandum that set forth Star Scientific's talking points for its November 29, 2011, call with senior UVa officials, including a talking point that ROBERT MCDONNELL had expressed his support for a grant application to the Tobacco Commission for Anatabloc® research.

77.     On or about February 9, 2012, JE sent a response email to MAUREEN MCDONNELL's email from earlier that day. JE stated, "Thanks, sorry for the delayed response, it has been very busy with session. Lets [sic] talk next week when you return."

78.     On or about February 10, 2012, MAUREEN MCDONNELL sent a response email to JE's email, stating:

> Pls call [JW] today get him to fill u in on where this is at. Gov wants to know why nothing has developed w studies after [JW] gave $200,000. I'm just trying to talk w [JW.] Gov wants to get this going w VCU MCV. Pls let us know what u find out after we return. [JW's] cell is 804-[xxx-xxxx]. Thanks, -mm

79.     On or about February 16, 2012, at 11:56 p.m., ROBERT MCDONNELL sent an email to JW, stating "[JW]. Know u have been slammed. Do u want me to call your lawyer on the certificates and the documents. Thanks for all your help. Gov." This email was in reference to a plan to have JW transfer shares of Star Scientific stock that JW owned to a Brokerage Firm A account for the defendants' use to fund MoBo.

80.     On or about February 17, 2012, at 12:02 a.m., ROBERT MCDONNELL sent an email to JE stating "Pls see me about anatabloc issues at VCU and UVA. Thx." Within minutes, JE sent a response email to ROBERT MCDONNELL stating "will do. We need to be careful with this issue."

81.     On or about February 22, 2012, MAUREEN MCDONNELL sent a text message to ROBERT MCDONNELL, stating "[JW] txted me 2say he needs our brokers name and phone number to transfer shares this week."

82.     On or about February 23, 2012, ROBERT MCDONNELL and MAUREEN MCDONNELL had a conference call with a Brokerage Firm A broker.  During the call, the defendants informed the broker that they owned Star Scientific shares that were being held by Star Scientific and that the defendants wanted to transfer the shares into a Brokerage Firm A account.  The defendants further stated that they planned on using the shares as collateral for a margin loan that would ultimately be utilized for MoBo.  The defendants gave the broker JW's contact information and asked the broker to call JW in order to coordinate the transfer of the Star Scientific stock to the Brokerage Firm A account.

83.     On or about February 29, 2012, ROBERT MCDONNELL had a private meeting with JW to discuss potential ways that JW could transfer 50,000 shares of Star Scientific stock that JW owned to a brokerage account controlled by the defendants.  ROBERT MCDONNELL and JW discussed whether such a transfer would be reportable by either ROBERT MCDONNELL or JW and their mutual interest in making sure that it was not.

84.     On or about February 29, 2012, the defendants attended the reception at the Governor's Mansion for healthcare leaders in Virginia.  Senior Star Scientific executives (including JW), researchers affiliated with Star Scientific, and medical professionals whom Star Scientific was attempting to impress (including from Virginia research universities) also attended the reception.

85.     On or about February 29, 2012, immediately following the healthcare leaders reception at the Governor's Mansion, the defendants, JW, and a scientific researcher affiliated

with Star Scientific attended a small dinner at the La Grotta restaurant in Richmond, Virginia.
JW paid for the dinner, which cost approximately $1,423.

86.     Because of concerns about disclosures that would be necessary if JW transferred
50,000 shares of Star Scientific stock to the defendants, JW and ROBERT MCDONNELL
agreed that JW would simply transfer $50,000 to MoBo as a loan to the defendants. The loan
was not documented and included a 2% interest rate and a three-year term. On or about March 6,
2012, JW instructed his assistant to write a check for $50,000 made payable to MoBo. To make
it more difficult for anyone to discern that JW was transferring money to the defendants, JW
instructed his assistant that the check should not reference the defendants. When JW's assistant
mistakenly put MAUREEN MCDONNELL's name in the memo line of the $50,000 check, JW
instructed his assistant to void that check and write a new check without MAUREEN
MCDONNELL's name, which the assistant did.

87.     On or about March 12, 2012, ROBERT MCDONNELL sent a text message to JW
stating "Do you have time tomorrow to talk with me on business matters. Governor. What time
are you available."

88.     On or about March 21, 2012, ROBERT MCDONNELL met with the Virginia
Secretary of Administration to discuss the Virginia state employee health plan and ways to
reduce healthcare costs in Virginia. During the meeting, ROBERT MCDONNELL pulled some
Anatabloc® out of his pocket and told the Secretary of Administration and one of her staff
members that Anatabloc® had beneficial health effects, that he personally took Anatabloc®, and
that it was working well for him. ROBERT MCDONNELL asked the Secretary of
Administration and her staff member to reach out to the "Anatabloc people" and meet with them
to discuss Anatabloc®.

26

89.     On or about May 18, 2012, ROBERT MCDONNELL sent a text message to JW stating "Per voicemail would like to see if you could extend another 20K loan for this year. Call if possible and I'll ask [MU] to send instructions." JW sent a response text message to ROBERT MCDONNELL stating "Done, tell me who to make it out to and address. Will FedEx."

90.     On or about Tuesday, May 22, 2012, per JW's instructions, JW's assistant wire-transferred $20,000 to MoBo's bank account.

91.     On or about May 25, 2012, JW sent a text message to ROBERT MCDONNELL stating "MoBo was done Tuesday. Golf game improving. Hope to play w you and Phil homestead. Star doing great." ROBERT MCDONNELL sent a response text message to JW stating "Thanks so much for the help. See you in a few weeks."

92.     On or about June 13, 2012, ROBERT MCDONNELL sent an email to JW stating "Stock looking good. Well done. Gov."

93.     On or about July 3, 2012, ROBERT MCDONNELL sent a text message to JW stating "Good announcements lately. Stock looks good. Hope all is well. You and [JW's wife] enjoy the 4th of July. Gov."

94.     From on or about August 31, 2012, through on or about September 3, 2012, ROBERT MCDONNELL and MAUREEN MCDONNELL vacationed as JW's guests at the Chatham Bars Inn, a luxury resort and spa in Cape Cod, Massachusetts. JW, a research scientist affiliated with Star Scientific, one of ROBERT MCDONNELL's political advisors, and their wives accompanied the defendants on the vacation. JW paid for the vast majority of the costs of the trip, including flying the defendants to Cape Cod aboard JW's jet, private cottages at the resort, golf at the resort course, expensive dinners, and the charter of a sailing yacht.

95.     From in or about November 2012 through in or about March 2013, the defendants obtained yard work and other miscellaneous home repairs at their personal residence from one of JW's brothers. Those services included the installation of a hot tub cover that JW purchased for the defendants and work to re-stain the defendants' deck at their personal residence.

96.     On or about December 21, 2012, MAUREEN MCDONNELL called a Brokerage Firm A broker to discuss the 6,672 shares of Star Scientific stock held in her brokerage account. MAUREEN MCDONNELL informed the broker that she wanted individual brokerage accounts opened for each of the defendants' five children and that she wanted to transfer shares of Star Scientific stock into the children's accounts. MAUREEN MCDONNELL further informed the broker that these transfers had to occur before year-end in order to avoid reporting requirements related to the ownership of Star Scientific stock.

97.     On or about December 26, 2012, MAUREEN MCDONNELL sent a letter to the Brokerage Firm A broker instructing him to transfer 1,000 shares of Star Scientific stock from her brokerage account to each of the defendants' five children's newly opened brokerage accounts. The Brokerage Firm A broker followed MAUREEN MCDONNELL's instructions and transferred a total of 5,000 Star Scientific shares from her account to the children's accounts. Although the transfers occurred on January 2, 2013, the transfers were made effective as of December 31, 2012, which resulted in MAUREEN MCDONNELL holding 1,672 shares of Star Scientific stock – valued at approximately $4,480 – as of year-end.

98.     On or about January 15, 2013, ROBERT MCDONNELL filed his SOEI. On the standardized disclosure form, ROBERT MCDONNELL stated that neither he nor any member of his immediate family owned securities valued in excess of $10,000 invested in any one business. On the personal liability section of the SOEI, ROBERT MCDONNELL stated that the personal

liabilities of his immediate family members to individual creditors were in an amount between $10,001 and $50,000 and that the principal business or occupation of the creditor was "Health Care." On the gift section of the SOEI, the only gifts associated with JW that ROBERT MCDONNELL disclosed were expenses related to the defendants' luxury vacation at Chatham Bars Inn.

99.   On or about January 21, 2013, MAUREEN MCDONNELL called JW's assistant to request that JW provide roundtrip airline tickets for two of the defendants' daughters to travel to a bachelorette party for one of the daughters in Savannah, Georgia. After getting JW's approval, JW's assistant made the travel arrangements for the defendants' daughters and obtained the tickets.

100.   On or about January 24, 2013, MAUREEN MCDONNELL sent a text message to JW, stating:

> [JW]! Would you like to stay at our Beach house in Sandbridge for some of the time you're in Virginia? Pick the best days and take the time with your family on the Ocean. Or You can have a Star Scientific retreat there and have your team come down and join you for a meeting. If one of the weekends works out with his legislative schedule, I'll bring Bob down and then you'd have some private time to talk somewhere he's comfortable. Let me know what you think. Mm

101.   On or about February 10, 2013, ROBERT MCDONNELL sent an email to the defendants' five children and courtesy-copied MAUREEN MCDONNELL. In the email, ROBERT MCDONNELL stated in relevant part, "Kids. Asking for help. need to rent the beach houses at Sandbridge more. Willing to give your friends a discount for the times it's tougher to rent." The next day, MAUREEN MCDONNELL forwarded ROBERT MCDONNELL's email to JW.

29

G.      **The Defendants' Efforts to Conceal the Scheme**

102.    On or about October 3, 2012, as part of required paperwork for a loan on one of the MoBo Virginia Beach properties through TowneBank, ROBERT MCDONNELL caused TowneBank to receive a personal financial statement that listed total liabilities of $2,075,000 and listed no other loans payable. The financial statement did not list any of the loans from JW.

103.    On or about February 1, 2013, ROBERT MCDONNELL and MAUREEN MCDONNELL caused a signed Uniform Residential Loan Application to be transmitted to PenFed as part of an effort to refinance four loans, including loans on the two MoBo Virginia Beach properties. The Uniform Residential Loan Application listed total liabilities of $2,837,226 and listed no loans from or liabilities to JW. It also did not list any Star Scientific securities held by the defendants as assets.

104.    On or about February 15, 2013, MAUREEN MCDONNELL was interviewed by law enforcement officers regarding the $50,000 and $15,000 checks from JW in May 2011. Although MAUREEN MCDONNELL stated that the $50,000 check was a personal loan from JW and that she had asked JW for the loan to help with the defendants' expenses and cash flow, she falsely claimed that there was a loan agreement that she had signed and that she was making periodic payments on the $50,000 loan. MAUREEN MCDONNELL described JW throughout the interview as a friend and falsely claimed that ROBERT MCDONNELL had met JW "many years ago." She further falsely claimed that ROBERT MCDONNELL first met JW when they both worked together at American Hospital Supply following ROBERT MCDONNELL's discharge from the United States Army.

105.    On or about February 18, 2013 – three days after MAUREEN MCDONNELL was interviewed by law enforcement – ROBERT MCDONNELL sent a five-page fax to a loan

officer at PenFed. On the first-page coversheet, ROBERT MCDONNELL wrote, "I reviewed the general loan application again this weekend and made some updates concerning information that was incomplete." The remaining four pages of the fax included handwritten changes by ROBERT MCDONNELL to the Uniform Residential Loan Application that had been originally signed by both defendants and sent to PenFed on or about February 1, 2013. The original loan application submitted by the defendants to PenFed did not include any reference to liabilities resulting from the $120,000 in loans from JW. ROBERT MCDONNELL's handwritten changes on or about February 18, 2013 listed $50,000 of liabilities to JW and $70,000 of liabilities to Starwood Trust, which was the entity through which JW had funded the loans to the defendants. ROBERT MCDONNELL further stated in his handwritten changes that payments due on the loans were zero and that the loans were unsecured. ROBERT MCDONNELL's handwritten changes on February 18, 2013, also listed 1,672 shares of Star Scientific stock with a value of $3,143 in the assets portion of the loan application.

106.    In or about March 2013, MAUREEN MCDONNELL met with JW's brother at the defendants' residence and told JW's brother that she had been interviewed by law enforcement. At that meeting, MAUREEN MCDONNELL – for the first time – asked JW's brother to send her a bill for the work JW's brother had performed for the defendants since approximately November 2012. Thereafter, on or about March 4, 2013, JW's brother sent an email to MAUREEN MCDONNELL stating "Find attached a list of expenditures for your residence."

107.    In or about March 2013, after telling JW's brother that she had been interviewed by law enforcement, MAUREEN MCDONNELL also gave JW's brother a box and letter. MAUREEN MCDONNELL asked JW's brother to give it to JW for her, and JW's brother caused it to be delivered to JW's house. The box included some of the clothing JW had purchased for MAUREEN MCDONNELL in April 2011, and it included a handwritten note from MAUREEN MCDONNELL to JW and his wife stating:

> I can't begin to thank you how special you made me feel on [CM's] wedding day and on our 35th Wedding Anniversary Day all dressed up in the beautiful outfits you adorned me in on both momentous occasions. I'm so happy we've been able to share so many significant milestones in our lives with you both! I truly hope your daughter will now be able to enjoy these lovely outfits and show them off on many grand occasions. If not, I'm sure there are many exemplary charitable organizations like we talked about who would welcome the opportunity to auction them for a wonderful cause having been worn only once by the First Lady of Virginia to her daughter's Wedding at the Executive Mansion and celebrating her 35th Wedding Anniversary with the Governor. Actually, if that happens I think I'll be there to bid on them myself! Please know that we cherish our friendship with you and look forward to many more wonderful memories together ahead! XOXO! Maureen McDonnell

## COUNT ONE

### (Conspiracy to Defraud the Citizens of Virginia of Their Right to Honest Services by Use of Interstate Wires)

108.    The allegations set forth in paragraphs 1 through 107 are repeated and realleged as if set forth fully herein.

109.    From in or about April 2011 through in or about March 2013, in the Eastern District of Virginia and elsewhere, defendants

**ROBERT F. MCDONNELL and
MAUREEN G. MCDONNELL**

did knowingly and intentionally conspire with each other and with others, both known and unknown to the grand jury, to commit wire fraud, that is: having devised and intending to devise a scheme and artifice to defraud the citizens of Virginia of their right to the honest services of the Governor of Virginia through bribery, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### PURPOSE

110.    A purpose of the conspiracy was for the defendants to secretly use ROBERT MCDONNELL's official position as Governor of Virginia to enrich the defendants and their family members by soliciting and accepting payments, loans, gifts, and other things of value from JW and Star Scientific in exchange for ROBERT F. MCDONNELL and the OGV performing official actions on an as-needed basis, as opportunities arose, to legitimize, promote, and obtain research studies for Star Scientific's products.

## MANNER AND MEANS

111.    The manner and means by which the defendants would and did carry out the
conspiracy included, but were not limited to, the following:

a.    the defendants soliciting and obtaining, both directly and indirectly, for
themselves and their family members financial payments, loans, gifts, and
other things of value from JW and Star Scientific;

b.    the defendants taking steps to conceal from the citizens of Virginia the
things of value received from JW and Star Scientific in order to hide the
nature and scope of their dealings with JW, including by routing things of
value through family members and corporate entities controlled by the
Governor in an effort to avoid annual disclosure requirements on the
Governor's SOEIs;

c.    ROBERT MCDONNELL and the OGV providing favorable official
action on behalf of JW and Star Scientific as opportunities arose, including
the official actions set forth below in (i)–(v);

i.    arranging meetings for JW with Virginia government officials,
who were subordinates of the Governor, to discuss and promote
Anatabloc®;

ii.    hosting, and the defendants attending, events at the Governor's
Mansion designed to encourage Virginia university researchers to
initiate studies of anatabine and to promote Star Scientific's
products to doctors for referral to their patients;

34

    iii.    contacting other government officials in the OGV as part of an effort to encourage Virginia state research universities to initiate studies of anatabine;

    iv.    promoting Star Scientific's products and facilitating its relationships with Virginia government officials by allowing JW to invite individuals important to Star Scientific's business to exclusive events at the Governor's Mansion; and

    v.    recommending that senior government officials in the OGV meet with Star Scientific executives to discuss ways that the company's products could lower healthcare costs.

(All in violation of Title 18, United States Code, Section 1349)

COUNTS TWO THROUGH FOUR

**(Use of Interstate Wire Communications to Further Scheme to Defraud the
Citizens of Virginia of Their Right to Honest Services)**

112.    The allegations set forth in paragraphs 1 through 107 and 110 through 111 are
repeated and realleged as if set forth fully herein.

113.    On or about the respective dates shown below, each such date constituting a
separate count of this Indictment, within the Eastern District of Virginia and elsewhere,
defendants

**ROBERT F. MCDONNELL and
MAUREEN G. MCDONNELL**

and others known and unknown to the grand jury, knowingly and intentionally, having devised
and intending to devise a scheme and artifice to defraud the citizens of Virginia of their right to
the honest services of the Governor of Virginia through bribery, for the purposes of executing
such scheme and artifice, transmitted and caused to be transmitted by means of wire
communication in interstate commerce writings, signs, signals, pictures, and sounds, that is the
following:

| Count | Date | Description |
|-------|------|-------------|
| 2 | 5/26/2011 | Wire communication from BB&T Bank in the Eastern District of Virginia to a location outside the Commonwealth of Virginia to cause the transfer of funds from $15,000 check from JW via Starwood Trust to wedding catering company account with BB&T Bank |
| 3 | 3/12/2012 | Wire communication from TowneBank in the Eastern District of Virginia to a location outside the Commonwealth of Virginia to cause transfer of funds from $50,000 check from JW via Starwood Trust to MoBo account with TowneBank |
| 4 | 5/22/2012 | Wire communication from the Eastern District of Virginia to a BB&T Bank location outside the Commonwealth of Virginia to cause the transfer of $20,000 from JW via Starwood Trust to MoBo account with TowneBank |

(All in violation of Title 18, United States Code, Sections 1343 and 2.)

36

<u>COUNT FIVE</u>

**(Conspiracy to Obtain Property under Color of Official Right)**

114.   The allegations set forth in paragraphs 1 through 107 and 110 through 111 are repeated and realleged as if set forth fully herein.

115.   From in or about April 2011 through in or about March 2013, in the Eastern District of Virginia and elsewhere, defendants

**ROBERT F. MCDONNELL** and
**MAUREEN G. MCDONNELL**

did knowingly and intentionally conspire with each other and with others, both known and unknown to the grand jury, to obstruct, delay, and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, that is to obtain property, not due ROBERT MCDONNELL or his office and to which ROBERT MCDONNELL was not entitled, from JW and Star Scientific, with their consent, under color of official right.

(All in violation of Title 18, United States Code, Section 1951.)

<u>COUNTS SIX THROUGH ELEVEN</u>

**(Obtaining Property under Color of Official Right)**

116.    The allegations set forth in paragraphs 1 through 107 and 110 through 111 are repeated and realleged as if set forth fully herein.

117.    On or about the respective dates shown below, each such date constituting a separate count of this Indictment, within the Eastern District of Virginia and elsewhere, defendants

**ROBERT F. MCDONNELL and
MAUREEN G. MCDONNELL**

and others known and unknown to the grand jury, knowingly and intentionally attempted to, did, and caused each other and others to obstruct, delay, and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, that is the defendants attempted to obtain, did obtain, and caused each other and others to obtain the property listed below, not due ROBERT MCDONNELL or his office and to which ROBERT MCDONNELL was not entitled, from JW and Star Scientific, with their consent, under color of official right:

| Count | Date | Description |
|-------|------|-------------|
| 6 | 5/23/2011 | $50,000 check from Starwood Trust |
| 7 | 5/23/2011 | $15,000 check from Starwood Trust |
| 8 | 5/29/2011 | $2,380 in greens fees, caddie fees, merchandise, and dining expenses at Kinloch Golf Club |
| 9 | 1/7/2012 | $1,424 in greens fees, caddie fees, merchandise, and dining expenses at Kinloch Golf Club |
| 10 | 3/6/2012 | $50,000 check from Starwood Trust |
| 11 | 5/22/2012 | $20,000 wire transfer from Starwood Trust |

(All in violation of Title 18, United States Code, Sections 1951 and 2.)

<u>**COUNT TWELVE**</u>

**(False Statement)**

118.    The allegations set forth in paragraphs 1 through 107 are repeated and realleged as if set forth fully herein.

119.    On or about October 3, 2012, within the Eastern District of Virginia and elsewhere, defendant

## ROBERT F. MCDONNELL

knowingly made a false statement and report for the purpose of influencing the action of TowneBank, the accounts of which were insured by the Federal Deposit Insurance Corporation, upon an application, commitment, and loan, and any change and extension of any of the same, by renewal, deferment of action, and otherwise, in that on ROBERT MCDONNELL's personal financial statement submitted to TowneBank, he stated that his liabilities totaled $2,075,000, when in truth and in fact, as the defendant well knew, ROBERT MCDONNELL owed at least $50,000 to JW that was not reflected on his personal financial statement and was not included in the total liabilities listed.

(All in violation of Title 18, United States Code, Sections 1014 and 2.)

## COUNT THIRTEEN

### (False Statement)

120.    The allegations set forth in paragraphs 1 through 107 are repeated and realleged as if set forth fully herein.

121.    On or about February 1, 2013, within the Eastern District of Virginia and elsewhere, defendants

**ROBERT F. MCDONNELL** and
**MAUREEN G. MCDONNELL**

knowingly made a false statement and report for the purpose of influencing the action of PenFed, a federal credit union, upon an application, commitment, and loan, and any change and extension of any of the same, by renewal, deferment of action, and otherwise, in that on the joint Uniform Residential Loan Application submitted to PenFed, the defendants listed total liabilities of $2,837,226 and listed no loans from or liabilities to JW, when in truth and in fact, as the defendants well knew, the defendants had received at least $120,000 in loans from JW that were not reflected on their joint Uniform Residential Loan Application and were not included in the total liabilities listed.

(All in violation of Title 18, United States Code, Sections 1014 and 2.)

## COUNT FOURTEEN

### (Obstruction of an Official Proceeding)

122.    The allegations set forth in paragraphs 1 through 107 are repeated and realleged as if set forth fully herein.

123.    In or about March 2013, within the Eastern District of Virginia and elsewhere, defendant

### MAUREEN G. MCDONNELL

attempted to and did corruptly obstruct, influence, and impede an official proceeding of the Grand Jury, that is, MAUREEN MCDONNELL wrote and caused to be delivered a handwritten note to JW in which she falsely attempted to make it appear that she and JW had previously discussed and agreed that the defendant would return certain designer luxury goods rather than keep them permanently.

(All in violation of Title 18, United States Code, Sections 1512(c)(2) and 2.)

### FORFEITURE NOTICE

Pursuant to Federal Rule of Criminal Procedure 32.2(a), the defendants are notified that upon conviction of the offenses alleged in Counts 1–11 of this Indictment, they shall forfeit any property, real or personal, which they obtained directly or indirectly and which constitutes or is derived from proceeds traceable to the offenses of conviction. Property subject to forfeiture includes but is not limited to the following:

> The sum of not less than $140,805.46;
> Black Rebecca Minkoff shoes;
> Black Louis Vuitton shoes;
> White Louis Vuitton shoes;
> Cream Louis Vuitton purse;
> Cream Louis Vuitton wallet;
> Silver Rolex Watch engraved with "71st Governor of Virginia";
> Yellow Peter Som dress;
> Blue Armani jacket and two matching dresses;
> Two Gold Oscar de la Renta dresses;
> Black Louis Vuitton rain coat;
> Gold Oscar de le Renta sweater;
> One pair of Amelia Rose earrings;
> One Gear sweatshirt;
> Two pairs of Foot Joy golf shoes;
> One button-down Ralph Lauren shirt;
> One white Peter Millar golf shirt;
> One baby blue striped Peter Millar golf shirt;
> One royal blue Peter Millar golf shirt;
> One aqua Fairway Greene Tech golf shirt;
> One white striped Ralph Lauren golf shirt;
> One Ping University of Virginia golf bag;
> One Ping Kinloch golf bag;
> One Sun Mountain Notre Dame golf bag;
> Two sets of golf clubs;
> One Heather Mackenzie water color and frame;
> Two iPhones; and
> 30 boxes of Anatabloc®.

If property subject to forfeiture is not available, the United States will seek an order forfeiting substitute assets in accordance with Title 21, United States Code, Section 853(p).

(In accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Title 18, United States Code, Section 982(a)(2).)

A TRUE BILL

DANA J. BOENTE
Acting United States Attorney

By: _____
Michael S. Dry
Jessica D. Aber
Ryan S. Faulconer
Assistant United States Attorneys

JACK SMITH
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By: _____
David V. Harbach, II
Deputy Chief